IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| SONYA BRATCHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-2005 |
| ) | |
| A.E. STALEY MANUFACTURING ) | |
| COMPANY, AND TATE & LYLE NORTH ) | |
| AMERICA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, A.E. Staley Manufacturing Company ("Staley"), and Tate & Lyle North America (collectively, the "Company"), by their attorneys and pursuant to Fed. R. Civ. P. 56 and CDIL-LR 7.1(D)(1), respectfully submit this memorandum of law in support of its motion for summary judgment.

**I.      INTRODUCTION**

The material facts in this case are undisputed. Plaintiff Sonya Bratcher ("Plaintiff") worked for the Company until her discharge on January 14, 2003. During her employment, she was a member of PACE International Union Local # 6-837 (the "Union"), and the terms of her employment were governed by the collective bargaining agreement between the Company and the Union. On August 11, 2002, Plaintiff took pregnancy leave under the Family and Medical Leave Act ("FMLA"). Concurrent with her FMLA leave, Plaintiff applied for and received benefits under the Company's Health & Accident Benefit Plan (the "H&A Plan"). To remain eligible for FMLA leave and benefits under the H&A Plan, Plaintiff was required to update the

CH1 10819226.4

Company on her medical condition by submitting a completed physician statement every thirty days.

On November 22, 2002, the Company sent Plaintiff a letter informing her that it had not received a physician statement since October 18, 2002. In response, the Company received two separate statements from Plaintiff. The first was signed by Plaintiff's physician on November 25, 2002. It indicated that Plaintiff gave birth with a normal vaginal delivery on November 14, 2002 and released Plaintiff to go back to work on January 3, 2003. The second was signed by Plaintiff's physician on December 17, 2002. This form indicated that Plaintiff had been released to return to work on December 18, 2002.

Plaintiff did not return to work on either December 18, 2002 or January 3, 2003. Beginning on January 3, 2003, she missed five scheduled work days and failed to contact her supervisors during her absence. Consequently, on January 14, 2003, Plaintiff was terminated for violating the labor agreement's no-call, no-show clause.

Plaintiff now argues that she was terminated because of her race, African-American. As a matter of law, Plaintiff's claim cannot survive summary judgment. Foremost, Plaintiff cannot even establish a *prima facie* case of race discrimination because there is no evidence that similarly-situated employees outside of the protected class were treated more favorably. Even if Plaintiff could make out a *prima facie* case of discrimination, Plaintiff cannot show that the Company's decision to terminate her for job abandonment was a pretext for race discrimination.

For these reasons, the Court should grant Defendant's motion for summary judgment and dismiss Plaintiff's claims in their entirety.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Jurisdiction and Venue.

1. This Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. ¶¶ 1331, 1343(a)(4); §§ 2201, 2202; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. ¶¶ 2000e et seq., and Section One of the Civil Rights Act of 1866, as amended, 42 U.S.C. ¶ 1981. (Defendants' Answer ¶ 1, Docket Entry # 2).

2. Venue is proper in this Court because the events alleged in the complaint allegedly occurred within this judicial district. (*Id.* ¶ 2).

### B. The Parties

3. Defendant A.E. Staley Manufacturing Company ("Staley") operates a facility (the "Plant") for the processing of corn into sweeteners, starches, and other products at 2200 East Eldorado Street, Decatur, Illinois 62521. (Larson Decl. ¶ 2). Staley is a company in the Tate & Lyle North American group. (Id.).[1]

4. Staley employs approximately 376 people at the Plant, 88 of whom are salaried employees and 288 of whom are hourly employees represented by the Union. (Larson Decl. ¶ __).

5. Staley and the Union are parties to a collective bargaining agreement dated October 1, 2002. (Pl. Ex. 3; Pl. Dep. 20).

---

[1] The materials cited herein are contained in the Appendix attached hereto. Citations to the declaration of ____ appear as "(___ Decl. ¶ ___)" and are attached at Tab A. Citations to the deposition of Plaintiff appear as "(Pl. Dep. __)" and are attached at Tab B. Citations to exhibits introduced at the deposition of Plaintiff appear as "(Pl. Dep. Ex. __)" and are attached at Tab C. Citations to the transcript of proceedings at Plaintiff's arbitration hearing appear as "(Arb. Tr. __")" and are attached at Tab D. Citations to exhibits introduced at Plaintiff's arbitration hearing appear as "(Co. Ex. ___)" and are attached at Tab E.

6. Plaintiff began her employment with Staley as a Packer on November 4, 1999. (Pl. Dep. 16).

7. After a 90-day probationary period, Plaintiff became a member of the Union, and remained a Union member throughout her employment. (Pl. Dep. 16-17).

8. From February 2002 through her termination on January 14, 2003, Bratcher working as an Operator in the Vico area. (Pl. Dep. 16, 17).

### C. The Company's FMLA And H&A Policies

9. The Company's Plant Handbook summarizes its FMLA policy. (Pl. Dep. Ex. 2 at pp. 31-33).

10. Under the Company's FMLA policy, FMLA leave runs concurrent with any paid or unpaid leave until the 12-week FMLA allotment has expired. (Pl. Dep. Ex. 2 at p. 32).

11. Employees taking FMLA leave are notified that "[p]eriodic medical certification is required in order to continue eligibility under the FMLA. The company may require certification of the serious health condition necessitating FMLA leave every 30 days." (Pl. Dep. Ex. 7; Pl. Dep. 26-27).

12. In addition to FMLA leave, the Company also provided its employees with its H&A plan, which provided for partial wage replacement for time missed due to non-work related illnesses or injuries. (Pl. Dep. 18; Pl. Dep. Ex. 3 at p. 28).

13. Employees seeking benefits under the H&A Plan were required to submit a completed physician's statement "not less than every 30 days in order to continue benefits." (Pl. Dep. Ex. 8; Pl. Dep. 27).

14. Plaintiff was familiar with the terms of the Company's FMLA and H&A policies. (Pl. Dep. 18-19).

15. Plaintiff understood that, to remain eligible for FMLA leave and for benefits under the H&A plan, she was required to submit a completed physician's statement every 30 days. (Pl. Dep. 26-28).

16. Plaintiff understood that it her responsibility to make sure that the proper information was provided to process her claim for H&A benefits. (Pl. Dep. 20).

17. Prior to August 2002, Plaintiff had taken two FMLA leaves at the Company, one in 200 and one in 2001. (Pl. Dep. Ex. 5,8; Pl. Dep. 18-20).

### D. Plaintiff's Medical Leave of Absence On August 15, 2002

18. On or about August 15, 2002, Plaintiff notified the Company that she was taking FMLA leave because of her impending pregnancy. (Pl. Dep. Ex. 10; Pl. Dep. 39).

19. Plaintiff never returned to work. (Pl. Dep. 39).

20. On August 20, 2002, Plaintiff received a letter from Carol Mattingly, Administrative Coordinator, Human Resources, notifying her of her eligibility to receive benefits under the H&A Plan. (Pl. Dep. 40; Pl. Dep. Ex. 11).

21. The August 20 letter provided in part:

> In order to receive pay under the H&A benefit plan, we must receive a completed physician statement from you at the beginning of your absence and at least every 30 days during your absence from work. If we do not receive the completed form on a timely basis, your benefits will be suspended pending receipt of the form. I have enclosed a supply of physician statements for your use. **I will also need a release from your doctor when he feels you are able to return to work.**

(Pl. Dep. Ex. 11) (emphasis in original).

22. Plaintiff understood that she was required to keep her supervisor up to date with respect to her ability to work, and that the physician's forms were to way to keep her supervisor up to date. (Pl. Dep. 64).

23. Plaintiff returned completed physician's forms on August 16, 2002, September 19, and October 18, 2002. All of the forms were signed by her physician. (Pl. Dep. Ex. 12, 13, & 14).

24. Plaintiff delivered her baby on November 14, 2002. (Pl. Dep. 56).

25. On November 22, 2002, Plaintiff received a letter from Carol Mattingly informing her that the Company had not received a completed physician statement from Plaintiff since October 18, 2002. Enclosed with the letter was a new form for completion. (Pl. Dep. Ex. 15).

26. Following the November 22, 2002 letter, the Company received two physician's forms from Plaintiff. (Pl. Dep. Ex. 16-17; Pl. Dep. 58).

27. The first form was signed by Plaintiff's physician, Dr. Odunzi, on November 25, 2002, and indicated that Plaintiff was released to go back to January 3, 2003. (Pl. Dep. Ex. 17).

28. The second form was signed by Dr. Odunzi on December 17, 2002 and indicated that Plaintiff was released to return to work December 18, 2002. (Pl. Dep. Ex. 16).

29. Plaintiff knew that her FMLA leave had expired in mid-December, 2002. (Plaintiff Dep. 66-67).

30. Plaintiff understood that she was expected to return to work once her doctor released her to return to work. (Pl. Dep. 69).

E.   **Plaintiff's Termination For No-Call, No Show**

31. On December 20, 2002, Gregg Hanselman, the Operations Manager for the Decatur plant, learned that Plaintiff had not returned to work on December 18, 2002. (Arb. Tr. 23; 26-37).

32. Hanselmann reviewed Plaintiff's medical records and discovered that Plaintiff had submitted physician's forms with two separate release dates. (Arb. Tr. P. 27-28).

33. Hanselmann decided: "Because there appeared to be some confusion between the two documents I gave her the benefit of the doubt and said, we will wait through the holidays and I will expect her back January 3d, based on the two documents. Even though the most recent document said December 18th, I went with the January 3d." (Arb. Tr. 28).

34. Plaintiff did not return to work on January 3, 2003, and also missed scheduled work days on January 7, 8, 9, 13 and 14. (Arb. Tr. p. 28; Larson Decl. ¶ 4).

35. The Company's collective bargaining agreement with the Union provides: "All seniority rights shall be forfeited and employment will be terminated upon the happening of any of the following events: …

> 5. Employee is absent for three (3) consecutive days working days without notifying the Company."

(Pl. Dep. Ex. 3 p. 10, Sec. 5.41).

36. Hanselmann consulted with Plaintiff's supervisor, Paul Zeck, who told him that he had not head from Plaintiff between January 3 and January 14, 2003. (Arb. Tr. p. 28-29). Zeck told Hanselmann that he had not heard from Plaintiff.

37. Hanselmann then contacted Joann Daugherty, the Company' Plant Payroll Personnel Administrator, and Rae Stoner, the Company's Human Resources Specialist. (Arb. Tr. p. 29-33, 92).

38. Both Daugherty and Stoner informed Hanselmann that they had spoken with Plaintiff in mid-December 2002, and advised her that her FMLA leave had run out and that she needed to return to work when she was released by her physician. (Arb. Tr. p. 29-33).

39. Hanselman requested and Stoner provided an e-mail documenting the conversation she had with Plaintiff back in December 2002. (Arb Tr. p. 33-34).

40. Hanselmann also reviewed documents relating to Plaintiff's prior FMLA leaves in 2000 and 2001. (Arb. Tr. p. 34).

41. Based on his review of those documents, Hanselmann concluded that "[i]n my mind, I felt Ms. Bratcher had a very good understanding of how our leave system worked, the forms that she needed to have filled out by herself and her doctors, and that she knew when she was to return to work." (Arb. Tr. p. 41).

42. Hanselmann also consulted with Joe Kerns, who works in the Company's Human Resources Department. (Arb. Tr. p. 42).

43. Hanselmann also "went back and looked at had we had any similar case to where we had had employees terminated for no call no show three consecutive days." (Arb. Tr. p. 43).

44. Hanselmann confirmed that three other employees also had been terminated for violating the labor agreement's no-call, no-show provision. (Arb. Tr. p. 43-44; Co. Ex. 13). All three of those employees are Caucasian males. (Larson Decl. ¶ 5).

45. Hanselmann concluded: "After speaking with Mr. Kerns, the basic conclusions were, one, that Ms. Bratcher knew she was to return to work; that she did not return to work; that she was familiar with our systems of leave; and that under the contract language, the course of action was to terminate her." (Arb. Tr. p. 44).

46. On January 14, 2003, Hanselmann sent a letter to Plaintiff informing her that her employment was terminated due to her "failure to return from a medical leave of absence and you [sic] absence for three consecutive working days without notifying the Company, in accordance with item #5 of Section 5.41 of our labor agreement." (Pl. Dep. Ex. 18).

F.  **Plaintiff's Complaint Of Discrimination**

47. On February 12, 2004, Plaintiff filed a complaint *pro se* against Defendants "for legal relief to redress discrimination on the basis of race." (Cplt. ¶ 1).

48. In her complaint, Plaintiff is not complaining of any other action other than her termination. (Pl. Dep. 93-94).

49. Plaintiff testified that she believed she was terminated because of her race:

> For reasons there are other -- that white females had been, had second and third changes at their jobs of safety issues, and absenteeism that I believe, and they were given second changes, maybe three or four chances. I mean, I don't know, the Union have that information. And me, I was never given a warning, I was never offered time off or nothing. I just was fired.

(Pl. Dep. 92). Plaintiff does not know the names of these alleged female employees. (Pl. Dep. 94).

50. As further alleged evidence of discrimination, Plaintiff also points to two white males, Steve Wisdom and Andy Anderson, whom she claims were not terminated for safety violations. (Pl. Dep. 95-96).

51. Plaintiff has no first-hand knowledge to support her allegations. (Pl. Dep. 97-98).

### III.  APPLICABLE LAW

#### 1.  The Applicable Summary Judgment Standard.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Summary judgment, which is designed to "isolate and dispose of" factually unsupported claims, is required when the record evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is "no genuine issue" when, taking the record as a whole, a rational trier of fact could not find in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Under settled principles, neither the "mere existence of some alleged factual dispute" nor the existence of "some metaphysical doubt as to the material facts" is sufficient to avoid summary judgment.  *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 571 (7th Cir. 1998) (quoting *Matsushita*, 475 U.S. at 586).  Rather, the plaintiff must tender cold, hard, specific facts that establish a necessary and genuine issue for trial.  *See Patt v. Family Health Sys.*, 280 F.3d 749, 752 (7th Cir. 2002)

#### 2.  The Applicable Standards for Plaintiff's Race Discrimination Claim.

Plaintiff brings her claim of race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. ¶¶ 2000e et seq., and Section One of the Civil Rights Act of 1866, as amended, 42 U.S.C. ¶ 1981.  Under both acts, Plaintiff may prove discrimination in one of two ways: (1) by presenting direct evidence that Defendants' decision to discharge her was motivated by her race; or (2) proceeding through the indirect, burden-shifting method outlined in *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973).  *See Stone v. City of Indianapolis*, 280 F.3d 640, 644 (7th Cir. 2002); *Eiland v. Trinity Hospital*, 150 F.3d 747,

751 (7th Cir. 1998); citing *Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176 (7th Cir. 1996) (Section 1981 and Title VII discrimination claims are both analyzed in the same manner).

Here, Plaintiff offers no direct evidence of race discrimination. Thus, she must prove her case through the *McDonnell Douglas* indirect method of proof. To prove race discrimination under this method, Plaintiff must first establish a *prima facie* case of discrimination. To do so, Plaintiff must show: 1) she is a member of a protected class; 2) she was performing her job satisfactorily; 3) she was discharged or suffered some other adverse employment action; and 4) the Company treated similarly situated employees outside the protected class more favorably. *Herron v. Daimler Chrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1034 (7th Cir. 2004); *Vaharia v. Swedish Covenant Hospital*, 190 F.3d 799, 810 (7th Cir. 1999).

If (but only if) a plaintiff has made this showing, there is a rebuttable presumption that he was discriminated against. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. *Dandy v. United Postal Service*, 388 F.3d 263, 273 (7th Cir. 2004); *Stockett v. Muncie Indiana Transit Sys.*, 221 F.3d 997, 1000-01 (7th Cir. 2000) (citations omitted). At this stage, "the employer need not prove that it was actually motivated by the proffered reason." *Id*. Rather, an employer "'need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *Id*. (*citing Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)). Once the defendant meets this burden of production, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext for discrimination. *Id*. (citations omitted).

"'[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Stutler v. Illinois Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)(affirming summary judgment for employer where plaintiff failed to establish prima facie claim); *Dandy v. United Postal Service*, 388 F.3d 263, 273 (7th Cir. 2004); (same); *Yang v. Young Women's Christian Ass'n Madison*, No. 03-2970, 2004 WL 445142 * 3 (7th Cir. Mar. 9, 2004) (affirming summary judgment for employer where plaintiff could not establish pretext), *McCollough v. Snow*, No. 03-1039, 2003 WL 23018552 * 2 (7th Cir. Dec. 17, 2003); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (same).

## IV.   ARGUMENT

### A.   Plaintiff's Race Discrimination Claim Fails As A Matter Of Law.

The Defendants are party to a Labor Agreement that covers the majority of its employees in the Decatur, Illinois Plant. (Facts ¶ 3). A copy of the Labor Agreement is distributed to all Union employees represented by the Union. The Labor Agreement applies to all Union employees equally. Plaintiff had taken leave on two previous occasions and was well versed on the requirements that she present a completed physician statement every thirty days. (Facts ¶ 29). In addition, Plaintiff was also aware that if she was going to be absent from work, she must notify the Defendants or be subject to termination. (Facts ¶ 28). Plaintiff missed five days of work without contacting anyone. (Facts ¶ 25).

Faced with this issue, Defendants made the decision to terminate the Plaintiff in accordance with the Labor Agreement. No evidence remotely suggests that this choice was motivated by Plaintiff's race. Accordingly, summary judgment in favor of Defendants should be granted.

### 1. Plaintiff Cannot Establish a *Prima Facie* Case of Race Discrimination.

Plaintiff cannot establish the fourth element of her *prima facie* case.[2] To establish that necessary element, Plaintiff must show that Defendants treated similarly situated employees outside of her protected classes (males, non-African-Americans, or those who have not filed charges) more favorably than her.

To establish that another employee is similarly situated in a discipline or discharge context, Plaintiff must show that the other employee dealt with the same supervisor (or decisionmaker), was subject to the same standards, and had "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). *See also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects.").

Given the context of this case, Plaintiff must show that Defendants chose not to act upon reports of absenteeism similar to those attributed to Plaintiff where the "similarly situated" employee was outside of Plaintiff's protected classes. Plaintiff cannot, however, identify a single situation where Defendants received a report that an employee was in violation of absenteeism or job abandonment yet did not suspend and discharge the employee. (Facts ¶ 12-13). Defendants on the other hand, can demonstrate that they terminated two white male employees a year prior to Plaintiff's termination. (Facts ¶ 6).

---

[2] For purposes of this motion, Defendants do not challenge Plaintiff's ability to raise a genuine issue of fact on the remaining three elements of her *prima facie* case.

Because Plaintiff cannot identify such a situation, she cannot raise a rebuttable inference that her race or gender was the true reason for the actions taken against her. Thus, summary judgment on her claims is appropriate.

### 2. Plaintiff Cannot Establish That The Reasons Given By Defendants For Her Discharge Are A Pretext For Intentional Discrimination

Plaintiff cannot dispute that she was not aware of the no call / no show policy. Plaintiff testified in her September 28, 2004 deposition that she was aware of the policy. (Facts ¶ 24).

Thus, Defendants have satisfied its minimal burden to articulate legitimate, non-discriminatory/retaliatory reasons for the decisions to suspend and discharge Plaintiff. Having satisfied this burden, Plaintiff must demonstrate that the reasons given are a mere pretext for unlawful motivation. "Pretext does not mean a mistake, but rather, 'a phony reason for some action.'" *Logan v. Kautex Textron N.A.*, 259 F.3d 635, 640 (7th Cir. 2001). *See also, Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000) (the court's "only concern is whether the legitimate reason provided by the employer is in fact a true one"); *Alexander v. Wisc. Dept. of Health & Family Services*, 263 F.3d 673, 683 (7th Cir. 2001) (to show pretext, the plaintiff must establish that the employer's proffered reason is a lie or has no basis in fact).

Plaintiff cannot meet this burden. As the Seventh Circuit has instructed: "This Court has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." *Green v. National Steel Corp.*, 197 F.3d 894, 899 (7th Cir. 1999); *see also Lenoir*, 13 F.3d at 1133-34 (issue of pretext does not turn on plaintiff's claim of innocence, but whether employer reasonably believed the plaintiff was guilty of offense).

## V. CONCLUSION

For all of the foregoing reasons, Plaintiff has failed to present evidence that a genuine issue of material fact exists as to whether Defendants discriminated against her in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. ¶¶ 2000e et seq., and Section One of the Civil Rights Act of 1866, as amended, 42 U.S.C. ¶ 1981.  Therefore, her claims fail as a matter of law, and Defendants respectfully requests that the Court grant Defendants' motion for summary judgment on all claims in Plaintiff's complaint.

**DATED:  December 15, 2004**               Respectfully submitted,
                                            A.E. STALEY MANUFACTURING
                                            COMPANY, AND TATE & LYLE NORTH
                                            AMERICAN


                                            By   /s/ Colette M. Savage
                                                        One of Their Attorneys

Sari M. Alamuddin
Colette M. Savage
SEYFARTH SHAW LLP
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603
(312) 346-8000

CH1 10819226.4

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT was served upon Pro Se Plaintiff via Certified Mail Return Receipt Requested, on this 15th day of December, 2004:

        Sonya Bratcher
        456 East Stuart Avenue
        Decatur, Illinois  62526

        /s/  Colette M. Savage
        Colette M. Savage