**E-FILED**
Wednesday, 15 December, 2004  03:34:17 PM
Clerk, U.S. District Court, ILCD

# TAB A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

SONYA BRATCHER,                          )
                                         )
      Plaintiff,                         )
                                         )
v.                                       )   Civil Action No. 04-2005
                                         )
A.E. STALEY MANUFACTURING                )
COMPANY, AND TATE & LYLE NORTH           )
AMERICA,                                 )
                                         )
      Defendants.                        )
_____)

## DECLARATION OF MARC W. LARSON

Pursuant to 28 U.S.C. ¶ 1746, I, Marc W. Larson, state as follows:

1.    Since October 1, 1998, I have held the position of Corporate Counsel for Tate &

Lyle North America, Inc.

2.    A.E. Staley Manufacturing Company ("Staley") is a company in the Tate & Lyle

North America group. Staley operates a facility for the processing of corn into sweeteners,

starches and other products at 2200 East Eldorado Street, Decatur, Illinois 62521. Staley

employs approximately 393 people at the Decatur facility, 110 of whom are salaried employees

and 283 of whom are hourly employees represented by Local 6-837 of the Paper, Allied

Industrial, Chemical & Energy Workers International Union. Staley and the Union are parties to

a collective bargaining agreement dated October 1, 2002.

3.    As Corporate Counsel for Tate & Lyle North America, I have access to the

personnel records maintained for Staley employees at the Decatur facility.

4.    I have reviewed the personnel records of Sonya Bratcher and investigated her

charge of discrimination. Based on my review of those records and the investigation I

conducted, I learned that Ms. Bratcher missed her scheduled work time as a member of A Team in the Vico Area on January 3 and then missed a complete three day rotation on January 7, 8 and 9. She also missed her scheduled work times on January 13 and 14.

     5.      As part of my investigation into Ms. Bratcher's charge of discrimination, I determined that, prior to Ms. Bratcher's termination, three employees had their employment terminated for not reporting to work for more than three consecutive days: George Stokes, Tom Sturgill and Brian Chandler. Attached as Exhibit 1 to my declaration are copies of the termination letters sent to all three employees. All three employees are Caucasian.

     I declare under penalty of perjury that the foregoing is true and correct.

Date: December 13, 2004.

_Marc W. Larson_ (signature)

Marc W. Larson

2

# TAB B

1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF ILLINOIS
2                 STATE OF ILLINOIS

3   SONYA BRATCHER,

4         Plaintiff,

5         -vs-                        No. 04-2005

6   A.E. STALEY MANUFACTURING
    COMPANY AND TATE & LYLE NORTH
7   AMERICA,

8         Defendants.

9                       DEPOSITION

10        The Deposition of SONYA BRATCHER, a

11   citizen of the State of Illinois, a witness of

12   lawful age; produced, sworn, and examined upon her

13   corporeal oath, at the Offices at 301 West White,

14   Champaign, Illinois on September 28th, 2004,

15   before Deann K. Parkinson, CSR, Notary Public in

16   and for the County of Champaign and State of

17   Illinois, as a witness in a certain suit and

18   matter now pending and undetermined in the United

19   States District Court for the Central District of

20   Illinois.

21                 CSR License No. 84-002089

22

23

24



16

1      going to hire me, and he did.

2            Q.    Now, you started at Staley on November

3      4, 1999, correct?

4            A.    Yes.

5            Q.    You first started in the process support

6      position?

7            A.    Yes.

8            Q.    And that would have been in the VICO,

9      V-I-C-O area of the plant?

10           A.    Yes.

11           Q.    Can you tell me just briefly what your

12     job duties were?

13           A.    I started off as a packer.  Packer,

14     slice material handler where we pack dry soy

15     sauce.  Unloaded trailers.

16           Q.    Was that a Union position?

17           A.    Yes, it was.

18           Q.    I take it you became a Union member

19     after your probationary period was over?

20           A.    After 90 days, I believe, yes.

21           Q.    What was the name of the Union?

22           A.    Pace International.  I don't have that

23     number or anything available.

24           Q.    Was it local 6-837, does that sound

17

1    right?

2        A.    Could be.  I can't remember.

3        Q.    And you were a member of the Union

4    throughout your employment there?

5        A.    Yes.

6        Q.    Now, at some point in time you bid for

7    an operator position, correct?

8        A.    Correct.

9        Q.    And you obtained an operator position in

10    the refinery area sometime around July 23, 2001?

11        A.    It wasn't operator.  It was like process

12    support, same thing.

13        Q.    But it was in the refinery area?

14        A.    Yes, process support.  I got transferred

15    down there because of the cutbacks in VICO.

16        Q.    And did you bid on an operator position

17    in the refinery area?

18        A.    No.  I bid an operator position in VICO.

19        Q.    When did you get that position?

20        A.    I believe it was in February of 2002.

21        Q.    Okay.  What were your job duties as an

22    operator?

23        A.    I was a blend operator where I made

24    final product for soy sauce.  We made soy sauce.

18

1      Q.    When you say were you a blend operator,

2    what did that entail?

3      A.    Making soy sauce.  I was like a finish

4    product operator, where we make the soy sauce for

5    the age tanks, the trucks that come in to pick up

6    the soy sauce.

7           (Whereupon, Deposition Exhibit No. 2 was

8    marked for identification.)

9      Q.    Now, showing you what we've marked as

10   Defendant's Exhibit No. 2, do you recognize this

11   generally as being the plant handbook for the

12   Decatur plant?

13     A.    I can't recall.  It could, you know,

14   probably so.  I'm quite sure we probably got it in

15   training or something.

16     Q.    At some point in time do you recall

17   receiving an employee handbook of some sort?

18     A.    I can't recall.  Like I say, probably

19   so.  I'm quite sure, but I can't recall at this

20   time.  But I'm quite sure we did.

21     Q.    Do you recall that the company had the

22   Family and Medical Leave Act policy?

23     A.    Right.  Yes, I do.

24     Q.    It also had a health and accident plan,

19

1    right?

2        A.    Yes.

3        Q.    And you were familiar with the terms of

4    those policies?

5        A.    Yes, I was.

6        Q.    How many FMLA leaves did you take while

7    you were working at Staley?

8        A.    My first one was in 2000, I was involved

9    in a car accident.    FMLA.    And then 2001 I was

10   injured, my finger, I don't know if it was work

11   related or at home, so I took care of that myself.

12   Then third one was when I went out when I was

13   pregnant in 2002.

14       Q.    So three FMLA leaves?

15       A.    Yes.

16       Q.    All right.    I want to turn your

17   attention to page 31 of Defendant's Exhibit 2.

18   You see there's a section there entitled extended

19   illness that describes the health and accident

20   plan, do you see that?

21       A.    Yes.

22       Q.    And the handbook states that, the second

23   paragraph, if you are absent due to an illness for

24   more than three scheduled work days or

20

1    hospitalized due to an injury call the plant

2    administration office to obtain an application

3    form, which includes a section for your physician

4    to complete.  Did you understand that to be the

5    way it worked?

6        A.    Yes.

7        Q.    Okay.  And likewise, it goes on to say

8    it is the employee's responsibility to initiate

9    this process and to insure that the proper

10   information is provided to process this claim.

11   Did you also understand that to be the case?

12       A.    Yes.

13       Q.    Let's mark this as Defendant's Exhibit

14   3.

15             (Whereupon, Deposition Exhibit No. 3 was

16   marked for identification.)

17       Q.    Ma'am, have you ever seen a copy of

18   Exhibit 3?

19       A.    Yes.

20       Q.    And that's a copy of the collective

21   bargaining agreement between the Pace

22   International Union local 6837 and Staley?

23       A.    Right, yes, it is.

24       Q.    Did you receive your own copy of the

26

1    exhibit 5, this was the only one that I got at

2    this time, and this is the year of the car

3    accident, because that happened in September of

4    2000, I believe.  But this is the only form that I

5    recall that I ever signed and sent back to Joann

6    when I was off on sick leave.  Any other time that

7    I didn't get one of these, but I recall getting a

8    front page, this was all that would come on the

9    front page where she would sign and mail it out

10    with the short term disability forms.

11        Q.    And my question was whether you got

12    copies similar to Defendant's Exhibit 6 with every

13    FMLA leave?

14        A.    Yes, I did.

15        Q.    Let's mark this as Defendant's Exhibit

16    7.

17              (Whereupon, Deposition Exhibit No. 7 was

18    marked for identification.)

19        Q.    Ma'am, I'm showing you what we have

20    marked as Defendant's Exhibit 7.  This is the

21    notification of FMLA eligibility that you got with

22    your second FMLA leave, right?

23        A.    Yes, it is.

24        Q.    And you recall receiving this one as

27

1    well?

2          A.    Yes.

3          Q.    And you read this notice as well?

4          A.    Yes, I'm familiar with it.

5          Q.    Let's mark this as 8.

6                (Whereupon, Deposition Exhibit No. 8 was

7    marked for identification.)

8          Q.    Now, do you recognize Defendant's

9    Exhibit 8?

10         A.    Yes, I do.

11         Q.    What is exhibit 8?

12         A.    It's a short term disability form for

13   when I was off in 2001 with my finger.

14         Q.    Was that a prerequisite for applying for

15   coverage under the health and accident plan?

16         A.    Yes.

17         Q.    And was that the first time that you

18   applied for coverage under the health and accident

19   plan?

20         A.    With this form?

21         Q.    Yes, ma'am?

22         A.    No, 2000 I did when I was in a car

23   accident.

24         Q.    So, this was the second time?

28

1       A.     Yes.

2       Q.     All right.   Now, the first part of

3    exhibit 8 that is your handwriting, correct?

4    Right above the physician's statement?

5       A.     Yes, correct.

6       Q.     All right.   And I take it that you read

7    that paragraph above your signature?

8       A.     Yes.

9       Q.     So, you understood that you had to

10    contact human resources in Decatur prior to your

11    return to work?

12       A.     Right, yes, I did.

13       Q.     You also understood that a medical

14    release was required at the time of your return?

15       A.     Yes.

16       Q.     You also understood that you had to keep

17    your supervisor up to date as to the status of

18    your inability to work?

19       A.     Yes.

20       Q.     And you also understood that a new

21    statement had to be submitted not less than every

22    30 days in order to continue benefits?

23       A.     Yes.

24       Q.     This particular exhibit, do you know how

39

1    received when you went out on your pregnancy
2    leave, is that right?
3        A.    Yes, it is.
4        Q.    What was the last day of work that you
5    had at Staley?
6        A.    It had to have been before the 15th
7    because I went to the doctor on the 14th.  So I
8    left work early that Sunday night, which I can't
9    recall the date.  And I went to the doctor on the
10    14th of August.
11        Q.    And that was, whatever date that was,
12    that was the last day you worked at Staley,
13    correct?
14        A.    Yes.
15        Q.    So I take it between August 15th, 2002,
16    when this notice was dated, and January 2003 you
17    never worked again at Staley, is that right?
18        A.    Right, yes, it is.
19        Q.    Now, did you like the prior forms, did
20    you read this form when you received it?
21        A.    I'm practically familiar with it.  I
22    didn't read them all.
23        Q.    But you were familiar with what it
24    contained?

64

1    A.    No, after that, because like I said once

2    I received a check, I know that my paperwork got,

3    this is my pay.  If this gets sent in I get paid.

4    If this don't get send in, I don't get a check.

5    Q.    But, if this doesn't get sent in also

6    you may not be eligible to be reemployed, correct?

7    A.    They never did explain that to me.

8    They would just let me know whether they received

9    it, letting me know if I'm still under a doctor's

10   care or not.  Carol would send me a letter.  They

11   would sometimes call me.  We just had that good

12   understanding between us.

13   Q.    But you understood you had to keep your

14   supervisor up to date as to your status?

15   A.    Yes, I understand that.

16   Q.    You understood that you had to keep your

17   supervisor up to date as to the status of your

18   ability to work?

19   A.    Correct.

20   Q.    And you understood that this form was

21   the way to keep the supervisor up to date, was it

22   not?

23   A.    Yes, it was.

24   Q.    Okay.  So it was important in that

56

1   our doctor's office.  And she submitted them to

2   the nurses about it and they said they did, but

3   she didn't receive this form, but this was in

4   December.  I got another letter from Carol

5   Mattingly.  I can't remember which day and I don't

6   have that letter on hand, whether I have it at

7   home or not.  I don't know.  But Carol Mattingly

8   sent me another letter in December stating that

9   she didn't receive a form from me in November.

10          Q.    And your testimony is you have that

11   letter at home?

12          A.    No, I say I doubt if I do.

13          Q.    All right.  Now, November 14th is the

14   date you had your baby, correct?

15          A.    Yes.

16          Q.    And do you remember what time of day you

17   had your baby?

18          A.    It was about one in the evening.

19          Q.    One in the evening?

20          A.    Yes.

21          Q.    So one AM?

22          A.    PM.

23          Q.    And how long were you in labor, do you

24   recall?

58

1      Q.   Do you have any idea why, in Defendant's

2  Exhibit 17, Dr. Odunsi has changed your date of

3  release to return to work or expected to return

4  from December 18th to January 3rd?

5      A.   I have my six weeks examination in

6  January.  That's my six weeks post partum.

7      Q.   That wasn't my question though.  My

8  question was, do you have any idea why Dr. Odunsi

9  changed the date from December 18th, 2002, to

10  January 3, 2003?

11      A.   No, I do not.  I can't answer that for

12  Dr. Odunsi.  No, I do not.

13      Q.   It's your testimony that both of these

14  forms were provided to the company, correct?

15      A.   Yes, they were.

16      Q.   And did you see copies of these forms

17  before they were sent to the company?

18      A.   No, I did not.  I never seen them, none

19  of this, never see these forms when we leave them

20  at the doctor's office.  We take them in and they

21  fax them, e-mail them in, however they do it.

22      Q.   I want to ask you some more questions

23  about Defendant's Exhibit 16 and 17.  Defendant's

24  Exhibit 16, which is the form dated by you on

66

1      A.     Yes.

2      Q.     And you testified truthfully in that

3      proceeding?

4      A.     Yes, I did.

5      Q.     Isn't it true that you told Miss Stoner

6      that you weren't going to be ready to return to

7      work due to the babysitting issues?

8      A.     No, I did not.

9      Q.     What did you tell Miss Stoner?

10     A.     I asked her was there any more time on

11     my FMLA to extend, until like my mother was

12     supposed to retire in January of that 2003.  And

13     just to get babysitting matters situated.  But I

14     never did say I have problems with a babysitter or

15     that I couldn't return to work because of

16     babysitter.  I had two babysitters, both of her

17     grandparents, grandmothers.

18     Q.     And she told you you had used up all

19     your FMLA leave, correct?

20     A.     Yes, she said you have, I forget, 12

21     weeks or something she was saying, yes.

22     Q.     So she told you you had used up those

23     entire 12 weeks?

24     A.     The conversation I can't recall

67

1    thoroughly, whether she did or not.  Could have
2    been yes.  Could have been no.
3         Q.    Well, ma'am, you understood-- hold on a
4    second.  Let me finish my question.  You
5    understood that you had up to 12 weeks of FMLA?
6         A.    Yes, I did.
7         Q.    You had been out more than 12 weeks,
8    correct?
9         A.    Yes, probably at that time, yes.
10        Q.    So, you understood that your FMLA leave
11   had expired?
12        A.    Yes.
13        Q.    All right.  Why were you calling miss
14   Stoner to inquire about additional FMLA leave?
15        A.    I didn't call for Miss Stoner.  I called
16   for Carol Mattingly.  And Carol was on vacation.
17        Q.    Why were you calling Carol Mattingly?
18        A.    To ask her questions about the FMLA.
19        Q.    Why?
20        A.    To ask her questions if I had any
21   extension on it because you can extend if it's a
22   family or medical emergency, and just to get
23   verification of that, which I had the paperwork,
24   but just to ask her a question pertaining to that.

69

1    know.  So Rae practically lied about everything

2    just to cover the fact that they were firing me.

3    A lot of things Rae said were lies.

4        Q.    Did Miss Daugherty tell you that you

5    were expected to return to work once you were

6    released from your position?

7        A.    She never did tell me that I was

8    expected to return to work because she didn't

9    know.  She asked me when I was going to doctor.  I

10   told her on January the 2nd.  She didn't know

11   whether Dr. Odunsi was going to release me or not.

12   Neither one knew at the time.  Even I didn't know

13   at the time.

14       Q.    Regardless of when you were coming back

15   though, you understood that you were expected to

16   return to work once your doctor released you to

17   return to work?

18       A.    If it was possible that I was released

19   to come back to work, yes.

20       Q.    And you knew the company expected you to

21   return to work once you were released to return to

22   work?

23       A.    If that was, if I was released to return

24   to work, yes, the company would have known if I

1    exhibit 21 for a second.  You understood that in

2    your complaint you're claiming that Staley

3    discriminated against you on the basis of your

4    race?

5         A.    Yes.

6         Q.    How did they do that?

7         A.    For reasons there are other -- that

8    white females that has been, had second and third

9    chances at their jobs of safety issues, and

10   absenteeism that I believe, and they were given

11   second chances, maybe three or four chances.  I

12   mean, I don't know, the Union have that

13   information.  And me, I was never given a warning,

14   I was never offered time off or nothing.  I just

15   was fired.

16        Q.    Let me back up for a second.  I

17   understand that you're complaining that Staley

18   fired you because of your race, is that right?

19        A.    Race, gender, all of the above.

20        Q.    Well, which is it?

21        A.    Well, I consider all of them.

22        Q.    So you think you were terminated because

23   of your gender as well?

24        A.    Yes.

1          Q.    Any other reasons why you believe you

2     were terminated?

3          A.    There's no other reason why besides like

4     I said, the discrimination, the race, the gender.

5          Q.    Now, besides firing you, is there any

6     way in which you believe Staley discriminated

7     against you on the basis of your race and gender

8     while you were employed there?

9          A.    Repeat that one more time.

10         Q.    Are you complaining in this complaint of

11    any action by Staley other than firing you?

12         A.    Besides the discrimination on the race

13    and gender.

14         Q.    But that race and gender is in

15    connection with your termination, correct?

16         A.    Color, yes, and all.

17         Q.    But are you complaining of any action

18    that Staley took against you other than firing

19    you?

20         A.    There is no other action at this time

21    that I can recall at the top of my head.

22         Q.    So to be clear then this lawsuit is

23    about the unlawful termination, in your mind at

24    least?

94

1      A.    Wrongful termination, yes, at this time.

2      Q.    All right.  Now, let me ask you this:

3  Besides the white females who were given second

4  and third chances, are there any other facts that

5  you believe that support your claim that you were

6  discriminated against because of your race and

7  gender?

8      A.    Besides the white, sorry, I couldn't

9  understand that.

10      Q.    Let me ask you again.

11      A.    I was reading through this.

12      Q.    Besides the white females who you claim

13  were given second and third chances, are there any

14  other facts that support your claims that you were

15  discriminated against on the basis of your race

16  and gender?

17      A.    Not at this time.  I can't recall.

18      Q.    Okay.  Do you know the names of these

19  white females?

20      A.    No, like I said, the Union had those

21  names, one of them, I don't know her last name, I

22  can't think of the girl's name.  Because she bid

23  into VICO after the fact when I was down in the

24  refinery.  I can't think of her name.  In VICO.

1       And it was another lady I was hearing at the time,

2       she worked down in cogent, what they called it, I

3       believe, and dextrose, I'm not for sure which

4       plant it was.

5           Q.    Do you know how many white females are

6       you talking about here?

7           A.    It was more than two, I know.

8           Q.    Do you know the number?

9           A.    Excuse me?

10          Q.    Do you know the actual number?

11          A.    No.

12          Q.    Do you know when these people were

13      terminated?

14          A.    No, I do not.  I don't have that

15      information.

16          Q.    Do you know what they were terminated

17      for?

18          A.    What they were terminated?  One of them

19      I believe was about a safety issue, but she wasn't

20      terminated.  She was just given suspended at the

21      time.  It also was white males at the time too

22      were safety issue.  There was two of them in my

23      building.  And it was one, I think worked in --

24      call it wet mill, and the refinery, it was a few

96

1    of them down there in the refinery practically

2    over the plant.

3        Q.    Do you know the names of those white

4    males?

5        A.    In my building I recall Steve Wisdom,

6    Andy Richardson, Andy Anderson; I believe, Andy

7    Anderson is his name.

8        Q.    And it's your testimony that both those

9    individuals had safety violations without being

10   terminated?

11       A.    Was injured.  And wasn't terminated.

12   One of them got his hand caught in a -- we call it

13   a sealer, what we seal the bags up in a packing

14   room, he got a pin in his thumb.  Andy got his arm

15   about slashed here while the packer machine was

16   running, they call it the bag presenter, he stuck

17   his hand in there while it wasn't locked out

18   tagged out, and he practically got his artery cut.

19       Q.    So both of them had safety violations

20   and were not terminated?

21       A.    Exactly.

22       Q.    Where did they work again?

23       A.    In VICO, the building I was in, VICO.

24       Q.    Was their supervisor Paul Zeck, do you

97

1    know?

2        A.    Yes, Paul Zeck was the area manager in

3    the building.

4        Q.    Did they work on the same shift as you?

5        A.    No, they was on different teams.  We

6    call it different teams.  They was on D team.  I

7    was on A team.

8        Q.    So you have no firsthand knowledge of

9    the events that took place, is that right?

10       A.    I heard it when we returned to work that

11   had happened.  One of the guys that worked on my

12   team worked overtime, Andy worked overtime with my

13   team.  Or either one of the guys worked with his

14   team and they were there when the incident

15   happened.  I think I was down in refinery when

16   that happened with Andy and with Steve.

17       Q.    So again my question is, do you have any

18   first hand knowledge of what happened?

19       A.    Not from me seeing it or being in it

20   myself no, I wasn't there. I believe, like I said

21   at the time, I was working in the refinery.

22       Q.    Everything you know about these

23   incidents is what you heard from a co-worker?

24       A.    Yes, and also from the e-mail that we

98

1     got over the computer, it was stated in there.

2          Q.    Now, these white women, what violations

3     did they have that they were not terminated for?

4          A.    I know one of them was a safety issue, a

5     lock out tag out issue as far as I remember what

6     hers was.  But the other lady, I can't recall at

7     this time.

8          Q.    Now, you didn't raise these individuals

9     in your grievance, did you?

10         A.    No, I did not.  At the time I wasn't

11    concerned.  All I was concerned about is fighting

12    for my job.

13         Q.    Well, didn't you think it would be

14    important, in terms of fighting for your job, to

15    point to people who had been treated differently

16    than you?

17         A.    At that time I wasn't even focusing on

18    that.  Like I said, I was just concerned about me.

19    All that hadn't even ran through my mind.

20         Q.    Have you told me all of the ways in

21    which you were discriminated against?

22         A.    Just a minute.  Repeat the question.

23         Q.    Have you told me all of the ways in

24    which you believe you were discriminated against?