**E-FILED**
Wednesday, 15 December, 2004  03:36:26 PM
Clerk, U.S. District Court, ILCD

# TAB D

1          IN ARBITRATION
2    FEDERAL MEDIATION & CONCILIATION SERVICE
3 IN THE MATTER OF THE      )
   ARBITRATION OF:         )
4                      )
   A.E. STALEY MANUFACTURING   )
5    COMPANY,          )FMCS #03-07456
                  )GRIEVANCE #03-01-004
6     and             )SONYA BRATCHER,
                  )  Grievant
7 PACE INTERNATIONAL UNION    )
   LOCAL 6-837         )
8
9
10        REPORT OF PROCEEDINGS of the Arbitration
11 Hearing before Arbitrator James L. Reynolds, on the
   25th day of September, 2003, at the hour of
12 9:00 a.m., at the Wingate Hotel, Decatur, Illinois,
   before Lisa A. Sims, Certified Shorthand Reporter,
13 Registered Professional Reporter and Notary Public.
14 APPEARANCES:
15     MR. JAMES L. REYNOLDS
      Labor Arbitrator
16
     MR. BRADFORD LIVINGSTON
17     Attorney for A.E. Staley
18     MR. DANNY WIRGES
      Assistant Director
19     PACE International Union, Region IX
20     MRS. LISA SIMS, CSR, RPR
      Arbitration Reporter
21
22
23
24

      1

| | INDEX OF EXHIBITS | | |
|---|---|---|---|
| EXHIBITS | | PAGE MARKED | PAGE RECEIVED |
| Joint Exhibits 1-4 | | | |
| (Marked prior to hearing) | | | |
| Company Exhibit No. 1 | | 12 | 16 |
| Company Exhibit No. 2 | | 12 | 16 |
| Company Exhibit No. 3 | | 12 | 16 |
| Company Exhibit No. 4 | | 12 | 16 |
| Company Exhibit No. 5 | | 12 | 16 |
| Company Exhibit No. 6 | | 12 | 16 |
| Company Exhibit No. 7 | | 12 | 16 |
| Company Exhibit No. 8 | | 12 | 16 |
| Company Exhibit No. 9 | | 31 | 32 |
| Company Exhibit No. 10 | | 33 | 34 |
| Company Exhibit No. 11 | | 34 | 36 |
| Company Exhibit No. 12 | | 38 | 39 |
| Company Exhibit No. 13 | | 43 | 46 |
| Company Exhibit No. 14 | | 47 | 48 |
| Company Exhibit No. 15 | | 49 | 50 |
| Company Exhibit No. 16 | | 50 | 51 |
| Company Exhibit No. 17 | | 54 | 55 |
| Company Exhibit No. 18 | | 56 | 56 |
| Company Exhibit No. 19 | | 77 | 78 |
| Union Exhibit No. 1 | | 66 | 68 |
| Union Exhibit No. 2 | | 68 | 82 |
| Union Exhibit No. 3 | | 87 | 96 |
| Union Exhibit No. 4 | | 97 | 98 |
| Union Exhibit No. 5 | | 99 | 100 |
| Union Exhibit No. 6 | | 100 | 101 |
| Union Exhibit No. 7 | | 105 | 133 |
| Union Exhibit No. 8 | | 107 | 133 |
| Union Exhibit No. 9 | | 109 | 133 |

      3

| | INDEX | | | |
|---|---|---|---|---|
| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
| GREG HANSELMAN | 22 | 57 | 74 | 79 |
| JOANNE DAUGHERTY | 83 | 87 | | |
| RAE STONER | 91 | | | |
| SONYA BRATCHER | 96 | 115 | | |

      2

1     ARBITRATOR REYNOLDS:  Go on the record,
2 please.  Let the record show that this is a
3 grievance arbitration hearing running between PACE
4 Local 6-837 and the A.E. Staley Manufacturing
5 Company of Decatur, Illinois.  The case is further
6 captioned as a discharge grievance involving
7 Ms. Sonya Bratcher, and further identified as
8 Grievance Number 2003-01-004, and identified as the
9 Federal Mediation & Conciliation Service Case Number
10 03-07456.  Today is the 25th of September, 2003, at
11 approximately 9 a.m. at the Wingate Hotel in
12 Decatur, Illinois.  Both parties to the dispute are
13 present in the hearing room.  The Union is
14 represented by Danny L. Wirges, Assistant Director
15 for Region IV of PACE International Union.  The
16 employer is represented by Bradford L. Livingston,
17 Attorney at Law, at the firm of Seyfarth & Shaw,
18 Attorneys at Law.  Another housekeeping matter that
19 I would like to take care of, as I am sure the
20 advocates are aware, arbitrators do, if a case would
21 appear to have educational value to others in the
22 future, make the award available for publication by
23 such agencies as the Commerce Clearinghouse or the
24 Bureau of National Affairs.  I would do that only

      4



1    MR. WIRGES:  Mr. Arbitrator, on January 14,
2  2003, the Grievant in this case, Sonya Bratcher, was
3  wrongfully terminated by the Company for failure to
4  return from a medical leave of absence.  Today, the
5  Union will show you through witness testimony, as
6  well as documentation, two very critical facts:
7  Number 1, Ms. Bratcher was legitimately off work
8  with her physician's approval during the time in
9  question; and secondly, the Company failed in their
10  obligation as an employer to seek out the reason of
11  the Grievant's extension to her medical leave.
12  After hearing the testimony and reviewing the
13  documentation, we would then ask you to uphold the
14  grievance and its remedy.  Thank you.
15    ARBITRATOR REYNOLDS:  Again, swearing
16  witnesses, I will do that all at one time.  So, if
17  you anticipate you will be giving testimony today,
18  would you please rise?  What I will ask you to do is
19  raise your right hand.  I will administer the oath
20  and start over here with Mr. Kerns, and as I make
21  eye contact with you state your name and say I do,
22  thereby accepting the oath.
23    (WITNESSES WERE ALL SWORN AT THIS POINT.)
24    ARBITRATOR REYNOLDS:  Mr. Kerns.
                          21

1    MR. KERNS:  Joseph Kerns, I do.
2    MR. HANSELMAN:  Greg Hanselman, I do.
3    MS. STONER:  Rae Stoner, I do.
4    MS. DAUGHERTY:  Joann Daugherty, I do.
5    MR. ZECK:  Paul Zeck, I do.
6    MS. BRATCHER:  Sonya Bratcher, I do.
7    MR. LARIMORE:  Denton Larimore, I do.
8    ARBITRATOR REYNOLDS:  Thank you, folks.
9  Please be seated.  The witness chair has been
10  prepared in front here not to make your testimony
11  any more intimidating, but to assure that the Court
12  Reporter and I do have a good, clear position to
13  hear your testimony and also to facilitate passing
14  documents back and forth.  With that, would the
15  employer call the first witness.
16    MR. LIVINGSTON:  The Company calls Greg
17  Hanselman as its first witness.
18    GREG HANSELMAN, called as a witness herein,
19  having been first duly sworn, testified as follows:
20        DIRECT EXAMINATION
21        BY MR. LIVINGSTON:
22    Q.  Would you state your name for the record,
23  please?
24    A.  Greg Hanselman.
                          22

1    Q.  Where do you work, Greg?
2    A.  Amylum UK.
3    Q.  And where is that located?
4    A.  London, England.
5    Q.  How long have you worked there?
6    A.  Three months.
7    Q.  What is your current position?
8    A.  Operations Manager.
9    Q.  What do you do there?
10    A.  We process wheat for starch, sweeteners, and
11  ethanol.  My responsibilities are the day-to-day
12  operations, the maintenance, and also personnel
13  issues within the plant.
14    Q.  Prior to going to work for Amylum, where did
15  you work?
16    A.  A.E. Staley, Decatur.
17    Q.  And what was your position there?
18    A.  Operations Manager.
19    Q.  How long did you hold that responsibility?
20    A.  About 18 months.
21    Q.  What were your duties as Operations Manager
22  at the Staley Decatur plant?
23    A.  Very similar to my current role.  Again,
24  manufacturing, maintenance, and employee
                          23

1  responsibilities.
2    Q.  What prior positions did you hold within the
3  A.E. Staley organization?
4    A.  Wet milling manager in Decatur.
5    Q.  Wet milling is an area of the Decatur
6  facility?
7    A.  Is one area within the Decatur plant, and
8  also the syrup refinery manager at the Louden,
9  Tennessee plant.
10    Q.  Prior to going to work for Staley, what
11  other experience in the industry do you have?
12    A.  I worked for Archer Daniels Midland for
13  seven and a half years.
14    Q.  Now, your current employer, is that -- is
15  that Staley part of the same family?
16    A.  Yes, Amylum and Staley are both companies
17  owned by Tate & Lyle, which is a London based
18  carbohydrate processing company.
19    Q.  Do you have any post-high school education?
20    A.  Yes.  I have a Bachelor's of Chemical
21  Engineering Degree from Iowa State.
22    Q.  When did you earn that?
23    A.  1988.
24    Q.  Are you familiar with Ms. Bratcher, the
                          24

**Page 25**

1 Grievant in this case?
2   A. Yes, I am.
3   Q. What area of the plant did she work in?
4   A. She worked in the VICO area, which is our
5 hydrolyzed vegetable protein area, then in the syrup
6 refinery area for a while, and then back in the VICO
7 area.
8   Q. Now, Greg, did Ms. Bratcher return to work
9 on January 3, 2003?
10   A. No, she did not.
11   Q. Did she return to work after December 18,
12 2003?
13   A. No, she did not.
14   MR. LIVINGSTON: Mr. Arbitrator, for the
15 record, we have stipulated to -- I think, to the
16 facts that led up to this, so hoping to avoid some
17 testimony of Mr. Hanselman...
18   ARBITRATOR REYNOLDS: Fine. If any
19 questions arise, I am sure we will get those out.
20 QUESTIONS BY MR. LIVINGSTON:
21   Q. Was Ms. Bratcher scheduled to work on
22 January 3rd?
23   A. Yes. By her schedule, January 3rd was the
24 third day of her rotation by schedule, which is set
                      25

**Page 26**

1 in advance.
2   Q. What do you mean by "rotation"?
3   A. It's a three on three off schedule, so she
4 would have been scheduled January 1st, 2nd and 3rd.
5 The 3rd would have been the last day of the three
6 consecutive scheduled days.
7   Q. So, she would have been scheduled off the
8 4th, 5th and 6th?
9   A. Yes.
10   Q. Did she report to work for the rotation
11 beginning on the 7th?
12   A. No, she did not.
13   Q. Did you learn of her absence from work?
14   A. Yes, I did.
15   Q. How did you learn that?
16   A. I believe in -- on December 20th was when I
17 first learned that she had not returned to work.
18 The reason I remember that is that's my birthday.
19 It was a Friday, and her immediate supervisor, Paul
20 Zeck, was on holiday for the Christmas and New Year,
21 and my boss, the plant manager Mark Roslak, was also
22 involved, so I was the one getting involved in the
23 situation. That was late on the afternoon of Friday
24 the 20th.
                      26

**Page 27**

1   Q. So, you are talking about the 20th of
2 December, and let me refer you to Company Exhibit 7.
3 Are you familiar with that document?
4   A. Yes, I am.
5   Q. Why is it that you noted her absence in
6 December?
7   A. Because this is the document that was signed
8 by her doctor on the 17th of December that stated
9 she was released to return to work on the 18th of
10 December.
11   Q. Now, what did you do upon learning of her
12 absence on the 20th?
13   A. I went back and looked at -- put together,
14 and it took me a day or two to do that. I believe I
15 pulled that together, or started pulling that
16 together on Monday, December 23rd. I was pulling
17 together all the documents in regards to the -- her
18 pregnancy leave, the short-term disability pay
19 continuance documents. I then found the November
20 document, the previous one to this that had stated
21 that she was scheduled to be released,
22 approximately, six weeks postpartum with a January
23 2nd date, I believe.
24   Q. Let me show you what's been introduced as
                      27

**Page 28**

1 Company Exhibit 6, and ask if you can identify that
2 document?
3   A. Yes, I can.
4   Q. Okay. Is that the document you referred to
5 showing a January 2nd return date?
6   A. Yes, it is, but it was a January 3rd return
7 to work date.
8   Q. Okay. So, in early December, when you saw
9 that document, what did you conclude?
10   A. Because there appeared to be some confusion
11 between the two documents I gave her the benefit of
12 the doubt and said, we will wait through the
13 holidays and I will expect her back January 3rd,
14 based on the two documents. Even though the most
15 recent document said December 18th, I went with the
16 January 3rd.
17   Q. Now, she didn't appear on the 3rd?
18   A. No, she did not.
19   Q. Nor for her next rotation?
20   A. No, she did not.
21   Q. Then, did she appear the first several days
22 of the following rotation?
23   A. No, she did not return to work, and we did
24 not hear from her from that time period of January
                      28

1  3rd through the 14th.
2      **Q.** So, what did you do then?
3      **A.** Again, went back and got with her
4  supervisor, Paul Zeck, who had returned from
5  vacation, and I consulted Paul to see if he had
6  heard from her and he had not. I also went back and
7  reviewed the documents again.
8      **Q.** Let me show you – you have got Company
9  Exhibits 6 and 8 in front of you?
10     **A.** 6 and 7.
11     **Q.** 6 and 7. Let me show you Company Exhibits
12  2, 4 and 5, as well.
13     **A.** Those would have been – those were
14  documents that I was reviewing and looking at as I
15  evaluated the situation.
16     **Q.** Okay. Did you contact anyone else?
17     **A.** Yes. I talked with Joann Daugherty.
18     **Q.** Who is Joann Daugherty?
19     **A.** Joann is our Plant Payroll Personnel
20  Administrator.
21     **Q.** Why did you contact her?
22     **A.** Joann gets involved and helps initiate FMLA
23  cases for the plant and sends out a packet of
24  information to kick that off. When we know, or when
                              29

1  we think an employee is going to be off for a period
2  of time that may fall under FMLA we send out a
3  packet of information for the employee, and Joann is
4  the one that does that.
5      **Q.** And what did you learn from Ms. Daugherty?
6      **A.** In talking with Ms. Daugherty, we reviewed,
7  again, the documents, but she also informed me that
8  Ms. Bratcher had called her somewhere in the middle
9  of December, and Ms. Bratcher was calling wondering
10  what options she had for other leave because she was
11  having trouble acquiring childcare for her newborn.
12     **Q.** Do you recall anything else that Ms.
13  Daugherty said during that telephone conversation?
14     **A.** Joann also told me that she did let Ms.
15  Bratcher know that there was a section in the
16  contract, the collective bargaining agreement, to
17  where the employee could petition the Company for
18  unpaid time off, and it's at the Company's
19  discretion to grant that or not.
20     **Q.** Did Joann tell you that she provided
21  information that Ms. Bratcher had spoken to anybody
22  else?
23     **A.** Yes. Joann told me that Ms. Bratcher had
24  also contacted Rae Stoner. Ms. Bratcher had talked
                              30

1  to Rae Stoner previous to Joann Daugherty, again, in
2  reference to what other options she had from a leave
3  standpoint. Both Ms. Stoner and Ms. Daugherty let
4  Ms. Bratcher know that her FMLA had run out; that
5  she needed to return to work when she was released
6  by her doctor.
7      **Q.** Do you recall anything else that Joann told
8  you at that time?
9      **A.** Just – I think that she had said that Ms.
10  Bratcher had called her – second reason Ms.
11  Bratcher had called her second was because Joann
12  happened to be on vacation at the time, and Sonya
13  had called Ms. Stoner because she couldn't get a
14  hold of Ms. Daugherty.
15     **Q.** How did you leave your conversation with Ms.
16  Daugherty?
17     **A.** I asked Joann to please document to me in
18  the form of e-mail, to the best of her recollection,
19  the phone conversation that she had with Ms.
20  Bratcher.
21     **Q.** Did she do so?
22     **A.** Yes, she did.
23        (COMPANY EXHIBIT NO. 9
24        WAS MARKED.)
                              31

1  QUESTIONS BY MR. LIVINGSTON:
2      **Q.** Let me show you, after providing a copy to
3  the Arbitrator and Mr. Wirges, what I have marked as
4  Company Exhibit 9. Greg, can you identify Company
5  Exhibit 9 for us?
6      **A.** Company Exhibit 9 is the e-mail that Joann
7  Daugherty sent me on January 13th.
8      MR. LIVINGSTON: I move the admission of
9  Company Exhibit 9.
10     MR. WIRGES: No objection.
11     ARBITRATOR REYNOLDS: Entered.
12  QUESTIONS BY MR. LIVINGSTON:
13     **Q.** After speaking with Ms. Daugherty, what did
14  you do next?
15     **A.** I then talked that day with Ms. Stoner.
16     **Q.** Okay. And what did she tell you?
17     **A.** Ms. Stoner told me that she also had been
18  contacted previous to Joann -- Ms. Daugherty, that
19  Sonya had called again, requesting one of the types
20  of leave that was available to her because she was
21  having childcare issues.
22     **Q.** What, if anything, did Ms. Stoner tell you
23  about her understanding about when she was expected
24  back to work?
                              32

1   A. Ms. Stoner informed me that she told Ms.
2  Bratcher that she was not aware of any other leave
3  that she had. She was out of FMLA, but she -- and
4  that she needed to return to work when she was
5  released by her doctor, and she referred her back to
6  the plant and to Joann Daugherty and her supervisor.
7   **Q.** Did Ms. Stoner tell you anything about when
8  Ms. Bratcher expected her doctor to release her?
9   A. Yes. Ms. Stoner had talked with Ms.
10  Bratcher and was under the impression that she was
11  scheduled to return and would be released from the
12  doctor around the holiday period. I don't believe a
13  specific date was given.
14   **Q.** Do you recall anything else that you and Ms.
15  Stoner discussed that day?
16   A. I asked her also to document, to the best
17  that she could, the conversation that she had had
18  with Ms. Bratcher in the form of an e-mail to me.
19   **Q.** Did she do so?
20   A. Yes, she did.
21   (COMPANY EXHIBIT NO. 10
22   WAS MARKED.)
23  QUESTIONS BY MR. LIVINGSTON:
24   **Q.** Again, after providing a copy to the
33

1  Arbitrator and to Mr. Wirges, let me show you what I
2  have marked for identification as Company Exhibit
3  10. Greg, can you identify Company Exhibit 10?
4   A. Company Exhibit 10 is the e-mail from Rae
5  Stoner to me documenting Rae's conversation with Ms.
6  Bratcher back in December.
7   MR. LIVINGSTON: I move the admission of
8  Company Exhibit 10.
9   MR. WIRGES: No objection.
10   ARBITRATOR REYNOLDS: Entered.
11  QUESTIONS BY MR. LIVINGSTON:
12   **Q.** Now, in addition to the conversations that
13  you had with Ms. Daugherty and Ms. Stoner, in
14  reviewing the current documents regarding her leave
15  of absence, did you review anything else?
16   A. Yes. I also wanted to review any previous
17  times that Ms. Bratcher had maybe been off on FMLA
18  or short-term disability.
19   **Q.** Did you find cases where she had done so?
20   A. Yes. There was a case in the fall of 2000
21  and a case in the fall of 2001.
22   (COMPANY EXHIBIT NO. 11
23   WAS MARKED.)
24  QUESTIONS BY MR. LIVINGSTON:
34

1   **Q.** Let me show you, if I can, what I have
2  marked as Company Exhibit 11. Greg, have you had a
3  chance to take a look at the documents that are
4  Company Exhibit 11?
5   A. Yes, I have.
6   **Q.** Are these the documents that you reviewed
7  about the September 2000 leave that Ms. Bratcher
8  took?
9   A. Yes, they are.
10   **Q.** Let me ask you, if I can, to --
11   MR. WIRGES: Before you get too far on the
12  testimony, I would object to the introduction of the
13  document on relevance to this case.
14   ARBITRATOR REYNOLDS: Any comment about
15  that?
16  QUESTIONS BY MR. LIVINGSTON:
17   **Q.** Certainly. Greg, let me ask you, why was it
18  that you wanted to take a look at prior plans that
19  Ms. Bratcher had filed -- prior claims?
20   A. I wanted to clarify in my mind that the --
21  whether or not the employee was familiar with our
22  system of being off from work and coming back to
23  work when released by the doctor.
24   MR. WIRGES: Utilization of FMLA time off as
35

1  a means of disciplinary action or implication of
2  anything contrary or contradictory to an employee is
3  against FMLA laws, as you are well aware, and that's
4  exactly how this is being used to reflect in a
5  manner for disciplinary action in this case against
6  the employee and FMLA doesn't allow it. I object.
7   ARBITRATOR REYNOLDS: The Union's objection
8  will be overruled. May enter these for the limited
9  purpose of showing the familiarity of the Grievant
10  with the procedures that are specified that she
11  should be aware of.
12   MR. LIVINGSTON: Greg, if we can -- then I
13  move -- I haven't moved the admission, but I move
14  the admission of Company Exhibit 11.
15   ARBITRATOR REYNOLDS: Entered with the
16  Union's objection noted.
17   MR. LIVINGSTON: In fact, I would note for
18  the record, as to Mr. Wirges' objection, that with a
19  hire date of November 4, 1999, Ms. Bratcher didn't
20  have enough time in to qualify for FMLA during this
21  STD period, so, there is an additional grounds for
22  finding that objection unmeritorious.
23  QUESTIONS BY MR. LIVINGSTON:
24   **Q.** Let me turn to the first page of Company
36

1  Exhibit 11, Greg, and ask you during what period of
2  time she received STD benefits?
3      A.  September 25th through October 15th.
4      Q.  And toward the bottom of that page there is
5  an Ret 10-16-00.  Can you tell me what that
6  reflects?
7      A.  Return to work on the 16th of October.
8      Q.  Take a look at -- the next one copied funny,
9  but the next three -- the next three pages, can you
10  tell us what they reflect?
11     A.  They reflect the short-term salary
12  continuance form that Ms. Bratcher signed and that
13  her doctor also signed.
14     Q.  The first one was completed by the doctor on
15  October 4th?
16     A.  Yes, it was signed by the doctor on October
17  4th.
18     Q.  That showed a return to work date on the
19  first page of that form, the second page of Company
20  Exhibit 11, of October 9th?
21     A.  Yes, it does.
22     Q.  She did not return to work on October 9th,
23  however?
24     A.  No, she did not.
                        37

1      Q.  What happened subsequent to that?
2      A.  She was again seen on the 13th and shown on
3  page 5 of Company Exhibit 11.  Further down that
4  page, date released to return to work October 16th,
5  signed on the 13th by the Company physician.
6      Q.  That is, in fact, the date that she
7  returned?
8      A.  Yes, it is.
9      Q.  Now, you also referred to another period of
10  leave in October of 2001, that Ms. Bratcher took?
11     A.  Yes.
12        (COMPANY EXHIBIT NO. 12
13         WAS MARKED.)
14  QUESTIONS BY MR. LIVINGSTON:
15     Q.  Let me show you what I have marked as
16  Company Exhibit 12, Greg.  I would ask if you can
17  identify Company Exhibit 12 for us?
18     A.  If you could give me a minute just to thumb
19  through this.  Yes, these are the documents
20  pertaining to Ms. Bratcher being off in October and
21  November time period of 2001.
22     Q.  Those are the documents you reviewed in
23  connection with the prior STD claim by Ms. Bratcher?
24     A.  Yes, they are.
                        38

1      MR. LIVINGSTON:  I move the admission of
2  Company Exhibit 12.
3      MR. WIRGES:  Objection.
4      ARBITRATOR REYNOLDS:  Overruled on the same
5  basis as was before.
6  QUESTIONS BY MR. LIVINGSTON:
7      Q.  Greg, what does the first page of Company
8  Exhibit 12 show?
9      A.  It shows that Ms. Bratcher was paid
10  short-term disability from October 16th through
11  December 2nd of 2001, and she returned December 3,
12  2001, per Joann.
13     Q.  Let me show you the second page of that
14  document.  What is that?
15     A.  The second page is a letter from Carol
16  Mattingly to Ms. Bratcher.  The letter is informing
17  Ms. Bratcher that she needs to get the forms filled
18  out and sent in for her short-term disability pay on
19  a timely basis or that pay will be suspended.
20     Q.  Then, what are the next two pages of Company
21  Exhibit 12?
22     A.  Those are the short-term salary continuance
23  forms that Ms. Bratcher signed on the 22nd of
24  October and that her doctor signed on the 22nd of
                        39

1  October.
2      Q.  So, for example, when that was signed on
3  October 22nd, what is 30 days after that?
4      A.  Would be November 22nd.
5      Q.  That's the date referred to on page 2 of
6  this document, the October 29th letter from Ms.
7  Mattingly?
8      A.  Yes, it is.
9      Q.  Referring you, then, to the next two-page
10  document signed October 31, 2001, with the
11  initials -- I believe that's MB.  Can you tell us
12  what that is?
13     A.  That, again, is the Company's short-term
14  salary continuance plan form that is signed MB on
15  the 31st of October.  The physician's name on page 1
16  of that is Marshall Brustein.  It says date released
17  to return to work October 28th, but there is no
18  name, employee name or signature or date on page 1.
19     Q.  Now, she did not return on October 28th, did
20  she?
21     A.  No, she did not.
22     Q.  Let me refer you to the last two pages of
23  the document and ask you if you can tell, or let
24  me -- the third to the last page, can you tell us
                        40

**ANCHOR COURT REPORTING**

1   A. It is a form filled out by the doctor.
2     Q. And when an individual goes on FMLA in your
3   facility, does he have to apply for it under Federal
4   law?
5     A. They have to apply for Family Medical Leave,
6   yes.
7     Q. How do they do that?
8     A. There is an application that would have been
9   mailed with this form, and if the leave of absence
10  is for a serious health condition of the employee
11  themselves the short-term disability forms would
12  have been included with this for sick pay.
13    Q. But your testimony is, you always include an
14  FMLA application with that package?
15    A. Early on, I am not sure we did because if
16  the employee was already off for their own serious
17  health condition we would have used the short-term
18  disability form, because if you qualify for
19  short-term disability and you have Family Medical
20  Leave time available and you qualify for that, they
21  automatically run together.
22    Q. And I understand that, but you still must
23  apply, don't you, if you know, to FMLA -- under the
24  Act, you still must make an application thereof; is
                        89

1   that correct?
2     A. I don't believe so, because if they qualify
3   for the sick pay and they have the time in the bank
4   for Family Medical Leave they automatically run
5   together.
6     Q. Under paragraph 2, does this indicate that
7   you are going to supply them with that Family
8   Medical Leave Act form to fill out and send back
9   within 15 days?
10    A. That's the medical certification form, yes.
11    Q. And do these employees have that in them?
12    A. Yes, they do.
13    Q. Approximately, how many times during the
14  period in question, from October until the time the
15  Grievant was discharged, did she personally contact
16  you in regard to her situation?
17    A. I talked to her in August when she notified
18  the Company of the pregnancy, and then I talked to
19  her in December when she called in regards to the
20  alternative leave of absence that might be
21  available, and I believe that's all up until the
22  time of discharge.
23    Q. Are you, personally, aware of any other
24  individuals that she contacted, in regard to her
                        90

1   situation during her pregnancy, at the facility, in
2   management?
3     A. During her pregnancy, no, I am not, other
4   than her area.  She is supposed to make contact with
5   her area.
6     Q. Do you have to have a written doctor's
7   release in order to come back into that facility?
8     A. It depends on the length of time the
9   employee is away.  For a short-term thing, stomach
10  flu overnight type of thing, no.
11    Q. Would Sonya have needed a written doctor's
12  release to re-enter the facility?
13    A. With that amount of time, yes.
14    MR. WIRGES:  Nothing further.
15    MR. LIVINGSTON:  Nothing.
16    ARBITRATOR REYNOLDS:  Thank you for your
17  testimony.
18    MR. LIVINGSTON:  The Company calls Rae
19  Stoner as its next witness.
20    RAE STONER, called as a witness herein,
21  having been first duly sworn, testified as follows:
22          DIRECT EXAMINATION
23          BY MR. LIVINGSTON:
24    Q. Rae, you have already been sworn, so you are
                        91

1   under oath.  Can you tell us where you work?
2     A. I work at Tate & Lyle North America.
3     Q. Tate & Lyle North America is the parent for
4   A.E. Staley?
5     A. Yes.
6     Q. And how long have you been employed by
7   Tate & Lyle?
8     A. About three years.
9     Q. What is your current position?
10    A. I am a Human Resource Specialist.
11    Q. How long have you held that responsibility?
12    A. Two years.
13    Q. Do you have any post-high school education?
14    A. Yes.  I have a Bachelor's Degree in Human
15  Resource Management.
16    Q. When did you obtain that?
17    A. May of 2001.
18    Q. Are you familiar with Sonya Bratcher?
19    A. Yes.
20    Q. Directing your attention to December of
21  2002, did you speak to her?
22    A. Yes, I did.  She contacted me.
23    Q. Can you tell us, approximately, when that
24  was?
                        92

1  what that is?
2      A. It is an e-mail from Mrs. Stoner to Ms.
3  Carol Mattingly asking Ms. Mattingly to call Sonya
4  Bratcher regarding her sick pay.
5      Q. Did she return on October 28th, the date
6  that's in the prior release?
7      A. No, she did not.
8      Q. Prior to that, did you receive another
9  salary continuation form signed by a doctor, the
10  last two pages of Company Exhibit 12?
11      A. Yes, we did.
12      Q. What did that show?
13      A. Those two pages show that Ms. Bratcher was
14  under the care of a Dr. Brustein and that there was
15  a date released to return to work possibly 12-3-01.
16      Q. That is, in fact, the date she returned?
17      A. Yes, she did. She returned on 12-3.
18      Q. Now, upon reviewing these two prior claims
19  that Ms. Bratcher had filed, what did you conclude?
20      A. In my mind, I felt Ms. Bratcher had a very
21  good understanding of how our leave system worked,
22  the forms that she needed to have filled out by
23  herself and her doctors, and that she knew when she
24  was to return to work.

41

1      Q. Did you consult with anyone else?
2      A. Yes. I talked to Joe Kerns.
3      Q. Who is Mr. Kerns?
4      A. Joe is in our HR Department, the Corporate
5  side. We utilize Joe for consultation on our Union
6  affairs. We talk with him on personnel issues
7  before we are going to look at a termination case,
8  just to review that we have all of the facts ahead
9  of us.
10      Q. What did you review with Mr. Kerns?
11      A. Again, went back through and reviewed the
12  documentation that I had looked at; reviewed with
13  him the Ms. Stoner and Ms. Daugherty discussions,
14  pertinent facts that I had at hand at the time,
15  talked through those things with Mr. Kerns.
16      Q. To what extent did you review the terms of
17  Joint Exhibit 1, the collective bargaining
18  agreement?
19      A. I talked through with Mr. Kerns how we would
20  approach this case; that I had taken the approach
21  and given Ms. Bratcher the benefit of the doubt up
22  to the early January 3rd time frame, but under the
23  collective bargaining agreement, three days no call
24  no show is immediate termination, and that was our

42

1  decision moving forward.
2      Q. Let me show you Joint Exhibit 1, and could
3  you point out for us what part of that agreement
4  talks about termination for three days without
5  calling or reporting?
6      A. On page 10 Section 5.41, Item Number 5:
7  "Employee is absent for 3 consecutive working days
8  without notifying the Company, all seniority rights
9  shall be forfeited and employment will be terminated
10  upon the happening of any of the following."
11      Q. To what extent did you review similar
12  situations that had happened in the past?
13      A. We also went back and looked at had we had
14  any other similar cases to where we had had
15  employees terminated for no call no show three
16  consecutive days.
17      Q. Did you discover any?
18      A. Yes. There were three that were very
19  similar.
20          (COMPANY EXHIBIT NO. 13
21          WAS MARKED.)
22  QUESTIONS BY MR. LIVINGSTON:
23      Q. Greg, let me show you what I have marked as
24  Company Exhibit 13, and ask if you can identify

43

1  those documents, three pages?
2      A. These are the three termination letters for
3  three other employees that were terminated under the
4  same contract language.
5      Q. Those are the other terminations that you
6  reviewed?
7      A. Yes.
8      Q. What conclusion did you reach after speaking
9  with Mr. Kerns?
10      A. After speaking with Mr. Kerns, the basic
11  conclusions were, one, that Ms. Bratcher knew she
12  was to return to work; that she did not return to
13  work; that she was familiar with our systems of
14  leave; and that under the contract language, the
15  course of action was to terminate her.
16      Q. Let me show you what's been introduced as
17  Joint Exhibit 3. Is that the letter that you sent
18  Ms. Bratcher notifying her of her termination?
19      A. Yes, it is.
20      Q. How did you send it?
21      A. I sent it certified mail.
22      Q. When you drafted the letter, did you notify
23  anyone else of the decision?
24      A. Yes. I let Joann Daugherty know, I let Paul

44

# TAB E

# TATE ⊛ LYLE

TATE & LYLE NORTH AMERICA

A.E. Staley Manufacturing Co.
2200 East Eldorado Street
Decatur, IL 62525
USA
Tel  217 423 4411
Fax 217 421 2216
www.tateandlyle.com

May 20, 2002

George E Stokes
Apt 214
3195 Beth Blvd.
Decatur, IL  62526

Dear George:

You were put on final warning for attendance on April 22, 2002.  That document stated
that "further missed work between April 22, 2002 and January 1, 2003, other than that
covered by the Family and Medical Leave Act, would be considered grounds for
immediate termination of your employment."  Since then, our records show that you have
not reported to work for more than three consecutive scheduled days and you have not
contacted the Company in regards to your absences.  The Company considers you to have
abandoned your job.  Your employment with A.E. Staley Manufacturing Company has
been terminated effective immediately.

Please contact me at 421-2828 to make arrangements to turn in your identification card,
vehicle tag, uniforms, keys, and for the removal of personal property from the Plant.  The
company property can be returned to the front gate.

Sincerely,

Keith Brazzell
Dextrose Area Manager

TATE & LYLE IS A GLOBAL LEADER IN CARBOHYDRATE PROCESSING. OUR BRANDS AND
HIGH QUALITY INGREDIENTS ADD VALUE TO CONSUMER PRODUCTS AROUND THE WORLD.

Staley

 **Staley**    A.E. STALEY MANUFACTURING COMPANY . 2200 E. ELDORADO STREET . DECATUR, ILLINOIS 62525 . 217/423-4411

July 14, 2000

Tom Sturgill
26 Sullivan Drive
Decatur, Illinois 62526

Dear Tom:

This letter is to inform you that your employment at the Decatur Plant of A. E. Staley
Mfg. Company - Tate & Lyle North America, Inc. has been terminated effective
immediately.   Allow me to explain the reasons for this action.

You were scheduled for work on July 12, 13 and 14.  You failed to report to work on all
three days and did not notify the Company concerning your absence.   You have,
therefore, forfeited and terminated your seniority rights in accordance with Section
5.41 (5) of the current Labor Agreement.

You will need to contact me to return your photo ID card and vehicle tag and to collect
any person items you may have left on Company property.

Sincerely,

Derek Paszkiewicz
Refinery Area Manager

Cc: Denton Larimore, Local #6-837, P.A.C.E.

PART OF THE
**TATE & LYLE**
GROUP

 Staley

A.E. STALEY MANUFACTURING COMPANY . 2200 E. ELDORADO STREET . DECATUR, ILLINOIS 62525 . 217/423-4411

May 2, 2000

Brian K. Chandler
2425 Country Trails Apt 40
Decatur, Illinois 62526

Dear Brian:

Our records show that you have not reported to work for your last three scheduled days
and you have not contacted the Company in regards to your absence. The Company
considers you to have abandoned your job. Your employment with A.E. Staley
Manufacturing Company has been terminated effective immediately.

Please contact Joann Daugherty at 421-2564 to make arrangements to turn in your
identification card and vehicle tag, for the removal of personal property from the plant,
and also to make arrangements to get your safety glasses that you recently ordered.

Sincerely,

Keith Brazzell
Dextrose Area Manager

PART OF THE
TATE & LYLE
GROUP

# TAB F



215 F.3d 1330 (Table)                                                        Page 1
215 F.3d 1330 (Table), 2000 WL 491689 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 215 F.3d 1330, 2000 WL 491689 (7th Cir.(Ill.)))**

**H**
**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA7 Rule 53 for
rules regarding the citation of unpublished
opinions.)


United States Court of Appeals, Seventh Circuit.

Riccardo A. MORA, Plaintiff-Appellant,
v.
CHICAGO TRIBUNE CO., Defendant-Appellee.

**No. 99-3241.**

Submitted April 14, 2000. [FN*]


> FN* After an examination of the briefs and
> the record, we have concluded that oral
> argument is unnecessary. Thus, the appeal
> is submitted on the briefs and the record.
> *See* Fed. R.App. P. 34(a).


Decided April 25, 2000.
Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 98 C 5270. Ruben Castillo, Judge.

Before Hon. JOHN L. COFFEY, Hon. JOEL M.
FLAUM, Hon. MICHAEL S. KANNE, Circuit
Judges.

ORDER

**\*1** Riccardo Mora filed this suit under Title VII
alleging that his employer, the Chicago Tribune
Company, fired him because he is Mexican

American and because he filed a discrimination
charge with the Illinois Department of Human
Rights (IDHR) and the EEOC. The district court
found that Mora failed to demonstrate that the
Tribune's proffered reasons for firing him were
pretextual and that Mora failed to make out a prima
facie case of retaliation. On appeal, Mora asserts
that summary judgment was improper and reiterates
his claims that similarly situated non-Mexican
American employees were treated more favorably.
We affirm.

Mora was hired in 1986 as a route driver, a job that
requires him to deliver papers, retrieve old papers,
and collect money along a specified route. In March
1993, Distribution Manager Kevin King, who is in
charge of the discipline of the route drivers, fired
Mora when his collections allegedly came up $2000
short. Mora challenged the termination by filing
charges of national-origin discrimination with the
IDHR and the EEOC. An IDHR fact-finding
conference was held in February 1996, and
ultimately the charges were dismissed for want of
evidence in July 1996. In the meantime, however, a
labor arbitrator had determined that the Tribune
lacked just cause to terminate Mora, so he was
rehired as a vacation relief driver in May 1994.
Mora returned to his position as a route driver in
May 1995.

The Tribune alleges that over the next nine months,
Mora's job performance deteriorated quickly and he
broke a number of rules. These difficulties came to
a head on February 26, 1996, when Mora got into a
fight with his helper, Jared Carter, inside an Osco
Drugs, a store operated by the Tribune's biggest
client. According to Carter, he and Mora got into a
disagreement over how to do their job. Carter (who
is 5'4" and weighs 140 pounds) says that Mora (who
is 6'1" and weighs 310 pounds) began cursing at
him and then grabbed him, shook him, tore his
sweater, and then drove away, leaving Carter at the
store. Joe Pisciola, a Chicago Sun-Times route
driver whom Mora identified as a witness to the
event, provided a written statement that Carter and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

215 F.3d 1330 (Table)
215 F.3d 1330 (Table), 2000 WL 491689 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 215 F.3d 1330, 2000 WL 491689 (7th Cir.(Ill.)))**

Page 2

Mora both were cursing at each other before Mora grabbed Carter and "shoved him about." Finally, Osco Drugs employee Diane Jones provided an oral statement basically agreeing with Pisciola, but Distribution Manager King later acknowledged that he normally does not consider statements that are not given in writing about these types of situations. Mora, who also gave only an oral statement to King, does not deny leaving Carter at the store, but he avers that Carter started the argument and made a fist and moved towards Mora in a threatening manner, and that he merely pushed Carter away in self-defense. Carter filed criminal charges, but Mora was acquitted.

During the Tribune's investigation of this incident, Division Manager Berger, Mora's direct supervisor, provided a written statement about an earlier confrontation between Mora and Carter and stated his belief that Mora had overreacted in that case. King then read the statement at a meeting attended by Mora and Berger. Soon after the meeting, Berger returned to King's office and claimed that, as he and Mora were walking away from the meeting, Mora called him a "motherfucking liar." Mora says he was referring to Carter, not Berger. An employee named Paula Milroe submitted a statement that she overheard Mora telling other workers he was referring to Berger.

**\*\*2** The Tribune suspended Mora for two days, claiming that his comment to Berger amounted to insubordination. On March 5, 1996, the Tribune terminated Mora. The termination letter sent to Mora cited not only the assault on Carter and insubordination but also poor job performance, poor customer service, and mishandling of company property as reasons for the termination. King testified at his deposition, however, that the assault alone justified firing Mora. Mora grieved his termination, but the labor arbitrator upheld it. Charges of discrimination and retaliation filed with the IDHR and EEOC were rejected for lack of substantial evidence. Mora received a right to sue letter from the EEOC in May 1998.

Mora filed suit in August 1998, alleging that the Tribune fired him because he is Mexican American and in retaliation for filing the charges of discrimination with the IDHR and the EEOC in

1993. In granting summary judgment for the Tribune, the district court found that Mora had failed to demonstrate a genuine dispute of material fact over the sincerity of the Tribune's proffered reasons for his termination. The court deemed Mora's evidence of pretext inadequate, noting that cases of employees who were involved in fights yet not fired were distinguished by the absence of witnesses or their occurrence in venues other than public areas such as the store of a major client. Finally, the district court held that Mora had failed to set forth a prima facie case of retaliation because he had offered no evidence to support his claim that King began creating a paper trial to justify Mora's discharge after learning about the IDHR fact-finding conference on Mora's first discrimination claim.

On appeal, Mora asserts that the district court erred in granting summary judgment, but offers little support. Mora reiterates his contention that non-Mexican American employees who committed similar rules violations were not fired and repeats anecdotes about a few of those employees. However, Mora acknowledges that the Tribune has submitted evidence that it fired thirty non-Mexican American employees between 1991 and 1996 for various rules infractions, and he simply argues that the Tribune treats its employees "arbitrarily" and therefore summary judgment was improper.

Before the district court, the Tribune and Mora spent much of their efforts arguing over Mora's job performance history. The Tribune alleges that Mora left newspaper boxes on his routes empty, broke or lost five hand-held computers used to record route information, delivered papers very slowly, requested inordinate amounts of overtime, and received numerous customer complaints about late deliveries and poor customer service. Mora either flatly denies or tries to explain away this behavior, and also avers that other employees were not punished for similar performance deficiencies. We need not address these issues because, as the Tribune has acknowledged, the main reason for the termination was Mora's fight with Carter.

**\*\*3** Assault is a legitimate, nondiscriminatory reason for firing Mora. *See, e.g., Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

(7 th Cir.1997). In order to have survived summary judgment on his discrimination claim, Mora was required to identify evidence creating a genuine issue of material fact regarding whether the Tribune gave the true reason for his termination. *See Flores v. Preferred Technical Group,* 182 F.3d 512, 516 (7 th Cir.1999). The Tribune need not be accurate or reasonable in its reasoning, merely honest. *See id.; Helland v. South Bend Community Sch. Corp.,* 93 F.3d 327, 330 (7 th Cir.1996). In this case, Mora needed to provide some evidence questioning the honesty of the Tribune's belief (actually King's belief, because he is the person responsible for firing Mora) that Mora assaulted Carter and that such behavior warranted termination. *See Giannopoulos,* 109 F.3d at 410.

Mora failed to show a genuine issue of material fact. His challenges to the facts of the altercation with Carter do not preclude summary judgment because what is at issue is not whether Mora actually assaulted Carter, but whether King genuinely believed that Mora assaulted Carter. *See Giannopoulos,* 109 F.3d at 411. Mora's attempts to undermine the credibility of King's belief also fail. Mora notes that Carter's statement was not written by Carter, but that in itself shows nothing since Carter signed the statement and verified it was true. Mora notes that King has acknowledged that he should not have relied on Diane Jones' oral statement, but King also had a written statement from Pisciola. Mora asserts that King got the driver to submit this statement simply to justify firing him, but he offers no proof of this assertion. A mere conclusory statement such as this one does not create an issue of fact. *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 985 (7 th Cir.1999). After all of Mora's protestations, this case is factually quite similar to *Giannopoulos,* 109 F.3d at 407-09, in which we upheld summary judgment for an employer that had fired an employee for hitting a co-worker in the face after a neutral third party verified the account provided by the worker who was hit.

Mora makes a final attempt to show pretext, however, by alleging that numerous other non-Mexican American employees were not fired for similar **rules violations**. Many of the people on Mora's list of "comparables" committed other,

less-serious offenses like covering another worker's route, or unprofessional conduct, or violating collection procedures. These employees are not **similarly situated** to Mora because, unlike their transgressions, Mora's involved an act of violence. *See Ibarra v. Martin,* 143 F.3d 286, 292 (7 th Cir.1998). Mora has also provided a short list of employees who were involved in physical altercations but not fired. But one of these employees is Mexican American, and Mora has failed to demonstrate that any are **similarly situated** because, as the Tribune and the district court noted, their fights had no witnesses and/or the fights did not occur in a public location. For all the above-mentioned reasons, Mora failed to demonstrate a triable issue of fact as to the whether the Tribune's proffered reason for firing him was pretextual.

**\*\*4** Mora's claim that he was fired in retaliation for filing charges of discrimination with the IDHR and EEOC in 1993 also fails. In order to establish a prima facie case of retaliation, Mora had to demonstrate a causal nexus between his filing of the charge of discrimination and his termination. *See Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1038 (7 th Cir.1998). In support of this claim, Mora notes that most of the citations for poor job performance appeared in his record after King received notice on December 4, 1995, that the IDHR was holding a factfinding conference on Mora's 1993 discrimination charge. Mora, pointing to King's deposition testimony, alleges that after King received the notice he directed Mora's immediate supervisors to create a "paper trial" to justify firing him. In fact, King testified that Mora's supervisors informed him that Mora was performing his job poorly and, in response, King asked them to keep him updated on Mora's performance. Mora has provided no evidence in support of his belief that King had any retaliatory motive, and his mere assertions are not enough to survive summary judgment. *See Jackson,* 176 F.3d at 985. Furthermore, the lack of a causal nexus in this case is suggested by the fact that Mora's supervisors began citing Mora for poor job performance six months before King received the IDHR notice. *See Bermudez v. TRC Holding, Inc.,* 138 F.3d 1176, 1179 (7 th Cir.1998); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 512 (7 th Cir.1998).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

215 F.3d 1330 (Table)
215 F.3d 1330 (Table), 2000 WL 491689 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 215 F.3d 1330, 2000 WL 491689 (7th Cir.(Ill.)))**

For the foregoing reasons, we AFFIRM the grant of summary judgment to the Tribune.

215 F.3d 1330 (Table), 2000 WL 491689 (7th Cir.(Ill.)) Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

- 99-3241  (Docket)

(Sep. 01, 1999)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.